MICHAEL F. RAM (SBN 104805)
**MORGAN & MORGAN COMPLEX**
**LITIGATION GROUP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone:      (415) 358-6913
Facsimile:      (415) 358-6923
mram@ForThePeople.com

JOHN A. YANCHUNIS
(*Pro Hac Vice application forthcoming*)
JEAN SUTTON MARTIN
(*Pro Hac Vice application forthcoming*)
PATRICK A. BARTHLE II
(*Pro Hac Vice application forthcoming*)
**MORGAN & MORGAN COMPLEX**
**LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 559-4908
Facsimile: (813) 222-4795
jyanchunis@forthepeople.com
jeanmartin@ForThePeople.com
pbarthle@ForThePeople.com

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

LAUREN PRICE, individually and on behalf of all other similarly situated,

Plaintiff,

v.

TWITTER, INC., a corporation,

Defendant.

Case No.

**CLASS ACTION COMPLAINT**

**CLASS ACTION FOR**
**(1) BREACH OF CONTRACT;**
**(2) BREACH OF IMPLIED CONTRACT;**
**(3) VIOLATION OF UCL, CAL BUS. &**
   **PROF. CODE §§ 17200, *ET. SEQ*., and**
**(4) UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

CLASS ACTION COMPLAINT

## **CLASS ACTION COMPLAINT**

Plaintiff Lauren Price, individually and on behalf of all others similarly situated, files this Class Action Complaint against defendant Twitter, Inc. ("Twitter" or "Defendant"), and in support states the following.

## **INTRODUCTION**

1.      Twitter operates an online communication service through its website, www.twitter.com, and through text messaging and mobile applications. The service allows registered users to communicate with one another by posting "tweets," or short messages currently limited to 280 characters or less, with which other users may interact through a "like," reply, or "retweet."

2.      In order to follow other accounts, or post, like, and retweet tweets, users must register for a Twitter account.

3.      This lawsuit concerns Twitter's surreptitious and undisclosed use of Plaintiff's and Class Members' telephone numbers and email addresses (hereinafter "Personal Information") for advertising and marketing purposes, and, ultimately, its own unjust enrichment.

4.       Twitter solicited and collected Plaintiff's and Class Members' telephone numbers and email addresses under the guise that they were to be used for various account security related functions, including two-factor authentication, account recovery, and account re-authentication, as further described below.

5.      In reality, Twitter was also using this Personal Information of Plaintiff and Class Members to line its own pockets—specifically, it utilized the provided telephone numbers and email addresses in its "Tailored Audiences" and "Partner Audiences" marketing products, thereby permitting advertisers to target specific groups of Twitter users by matching the telephone numbers and email addresses that Twitter collected to the advertisers' existing (or purchased) lists of telephone numbers and email addresses.

6.      On May 25, 2022, the Attorney General by the Federal Trade Commission ("FTC" or "Commission") filed a complaint concerning this conduct and likewise announced that Twitter will pay a $150 million fine to settle the allegations. *See United States of America v. Twitter, Inc.*,

Case No. 3:22-cv-3070. ECF. No. 1 (N.D. Cal.) ("2022 FTC Complaint"); Federal Trade Comm. *Twitter to pay $150 million penalty for allegedly breaking its privacy promises – again* (May 25, 2022), *available at* https://www.ftc.gov/business-guidance/blog/2022/05/twitter-pay-150-million-penalty-allegedly-breaking-its-privacy-promises-again.

7.     This case seeks vindication and recompense on behalf of the individual consumers whose personal information was connivingly collected and deployed.

## THE PARTIES

8.     Plaintiff Lauren Price is an adult domiciled in Maryland and has an active Twitter account and had an active account during the entire Class Period.

9.     Plaintiff Lauren Price is a Twitter user who between May 2013 and September 2019 provided her telephone numbers and/or email addresses (hereinafter "Personal Information") to Twitter regarding two-factor authentication, account recovery, and/or account re-authentication. She brings claims on behalf of other similarly-situated Twitter users in the United States (the "Class" defined in Paragraph 73, hereinafter the members of the Class are referred to as "Class Members") arising from Twitter's knowing, unauthorized, and undisclosed use of their Personal Information for advertising and/or marketing purposes.

12.     Twitter is a Delaware corporation with its principal place of business at 1355 Market Street, Suite 900, San Francisco, California, 94103. Twitter transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, Twitter has operated its online communication service through its website, www.twitter.com, and through its mobile applications.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendant because Twitter's principal place of business is in California.  Additionally, Defendant is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's and Class members' claims occurred in this State, including Google servers in California receiving the intercepted communications and data at issue, and because of how employees of Google in California reuse the communications and data collected.

14.     This Court has subject matter jurisdiction over this entire action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000, and at least one Class member is a citizen of a state other than California or Delaware.

15.     Venue is proper in this District because a substantial portion of the events and actions giving rise to the claims in this matter took place in this judicial District.  Furthermore, Twitter is headquartered in this District and subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS CONCERNING TWITTER

### I.     Twitter's History of Privacy Violations & Its Agreement with the FTC

16.     Twitter's violation of consumers' privacy rights is not new – it has been persistent and pervasive for at least a decade.

17.     In 2011, the FTC charged Twitter with engaging in deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), for its failures to provide reasonable security measures to prevent unauthorized access to nonpublic user information and to honor the privacy choices exercised by Twitter users. *See*, *In re Twitter, Inc*., C-4316, 151 F.T.C. 162 (Mar. 11, 2011) (Administrative Complaint) at ¶¶ 13-17. [1]

18.     Specifically, the Administrative Complaint asserted that Twitter had engaged in deceptive acts or practices by misrepresenting that users could control who had access to their tweets through a "protected account" or could send private "direct messages" that could only be viewed by the recipient when, in fact, Twitter lacked reasonable safeguards to ensure those choices were honored, such as restricting employee access to nonpublic user information based on a person's job requirements. *See* Administrative Complaint at ¶¶ 6, 11-12.

19.     The Administrative Complaint also alleged that Twitter had misrepresented the controls it implemented to keep user accounts secure, when, in fact, Twitter lacked reasonable safeguards to limit or prevent unauthorized access to nonpublic user information, such as secure

---

[1] The 2011 Administrative Complaint is also available at: https://www.ftc.gov/sites/default/files/documents/cases/2011/03/110311twittercmpt.pdf (last visited May 27, 2022).

4

password requirements and other administrative, technical, or physical safeguards. *See* Administrative Complaint at ¶¶ 10-12.

20.     Twitter entered a consent settlement to resolve the Commission's Administrative Complaint for alleged violations of Section 5(a) of the FTC Act which was memorialized in a 2011 order issued by the FTC. *See In re Twitter, Inc.*, C-4316, 151 F.T.C. 162 (Mar. 11, 2011) (Decision and Order) ("Commission Order" or "2011 Order").[2] The Commission Order became final in March 2011 and remains in effect. *See* Commission Order, Provision VIII.

21.     Provision I of the Commission Order, in relevant part, states:

> **IT IS ORDERED that respondent**, directly or through any corporation, subsidiary, division, website, or other device, in connection with the offering of any product or service, in or affecting commerce, **shall not misrepresent in any manner, expressly or by implication, the extent to which respondent maintains and protects the security, privacy, confidentiality, or integrity of any nonpublic consumer information**, including, but not limited to, misrepresentations related to its security measures to: (a) prevent unauthorized access to nonpublic consumer information; or (b) honor the privacy choices exercised by users.

*See* Commission Order, Provision I (emphasis added). The Commission Order required Twitter to refrain from such misrepresentations for a period of 20 years from the date of the Order (at least March 2, 2031). *See* Commission Order, Provision VIII.

22.     Importantly, the Commission Order defines "nonpublic consumer information" as, in relevant part, "an individual consumer's: (a) email address… [and] (c) mobile telephone number[.]" *See* Commission Order, Definition 3.

## II.     Twitter Misrepresented the Purposes for Which it Collected Plaintiff's and Class Members' Telephone Numbers and Email Addresses

23.     Twitter's platform is widely used. As of September 2019, Twitter had more than 330 million monthly active users worldwide, which included journalists, celebrities, commercial brands, and government officials.

---

[2] The 2011 Commission Order is also available at: https://www.ftc.gov/sites/default/files/documents/cases/2011/03/110311twitterdo.pdf (last visited May 27, 2022).

24.     Commercial entities regularly use Twitter to advertise to consumers. Indeed, Twitter's core business model monetizes user information by using it for advertising. In fact, of the $3.4 billion in revenue that Twitter earned in 2019, $2.99 billion flowed from advertising.

25.     Twitter primarily allows companies to advertise on its service through "Promoted Products," which can take one of three forms: (1) Promoted Tweets, which appear within a user's timeline, search results, or profile pages, similar to an ordinary tweet; (2) Promoted Accounts, which typically appear in the same format and place as other recommended accounts; and (3) Promoted Trends, which appear at the top of the list of trending topics for an entire day.

26.     Twitter offers various services that advertisers can use to reach their existing marketing lists on Twitter, including "Tailored Audiences" and "Partner Audiences." Tailored Audiences allows advertisers to target specific groups of Twitter users by matching the telephone numbers and email addresses that Twitter collects to the advertisers' existing lists of telephone numbers and email addresses. Partner Audiences allows advertisers to import marketing lists from data brokers like Acxiom and Datalogix to match against the telephone numbers and email addresses collected by Twitter. Twitter has provided advertisers the ability to match against lists of email addresses since January 2014 and against lists of telephone numbers since September 2014.

27.     Twitter has prompted users to provide a telephone number or email address for the express purpose of securing or authenticating their Twitter accounts. However, through at least September 2019, Twitter also used this information to serve targeted advertising and further its own business interests through its Tailored Audiences and Partner Audiences services. For example, from at least May 2013 until at least September 2019, Twitter collected telephone numbers and email addresses from users specifically for purposes of allowing users to enable two-factor authentication, to assist with account recovery (e.g., to provide access to accounts when users have forgotten their passwords), and to re-authenticate users (e.g., to re-enable full access to an account after Twitter has detected suspicious or malicious activity). From at least May 2013 through at least September 2019, Twitter did not disclose, or did not disclose adequately, that it used these telephone numbers and email addresses to target advertisements to those users through its Tailored Audiences and Partner Audiences services.

28.     As noted above, the 2011 Commission Order, among other things, prohibited Twitter from misrepresenting the extent to which Twitter maintains and protects the security, privacy, confidentiality, or integrity of any nonpublic consumer information.

29.     Yet, from at least May 2013 until at least September 2019, Twitter misrepresented to users of its online communication service the extent to which it maintained and protected the security and privacy of their Personal Information. Specifically, while Twitter represented to users that it collected their telephone numbers and email addresses to secure their accounts, Twitter failed to disclose that it also used user's Personal Information to aid advertisers in reaching their preferred audiences.  Twitter's misrepresentations violate the FTC Act and the 2011 Order, which specifically prohibited the company from making misrepresentations regarding the security of nonpublic consumer information like the Personal Information

30.     According to the 2022 FTC Complaint, more than 140 million Twitter users provided email addresses or telephone numbers to Twitter based on Twitter's deceptive statements that their information would be used for specific purposes related to account security. Twitter knew or should have known that its conduct violated the 2011 Order, which prohibits misrepresentations concerning how Twitter maintains email addresses and telephone numbers collected from users.

31.     Technology companies like Twitter recognize the monetary value of users' personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[3]

32.     Through its deceptive information collection techniques and misrepresentations, Twitter is unjustly enriching itself at the cost of consumer choice, when the consumer would

---

[3] Kari Paul, *Google launches app that will pay users for their data*, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study (last visited May 27, 2022); Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html (last visited May 27, 2022);; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounuciations-app (last visited May 27, 2022);.

otherwise have the ability to choose how they would monetize their own data.

**A.    Twitter's Deceptive Collection of Personal Information for Two-Factor Authentication**

33.    Since May 2013, Twitter has allowed users to log into Twitter with two-factor authentication using their telephone numbers. Users who enable this security feature log into their Twitter accounts with their usernames, passwords, and a code texted to their telephone numbers whenever they log in from a new or unrecognized device.

34.    Twitter prompts users to enable two-factor authentication through notices on their timelines and after users reset their passwords. Twitter also encourages users to turn on two-factor authentication in tweets from Twitter-operated accounts, Help Center documentation, and blog posts.

35.    To enable two-factor authentication, Twitter users must navigate to an account settings page. After clicking on "Security," users see a screen similar to the one depicted below



36.    When users click on the "Learn more" link, they see a webpage that says, "How to use two-factor authentication." This page states, in relevant part

> Two-factor authentication is an extra layer of security for your
> Twitter account. Instead of only entering a password to log in, you'll
> also enter a code or use a security key. This additional step helps
> make sure that you, and only you, can access your account.

37.    After clicking on the "Login Verification" checkbox above, users see additional instructions about how to enable two-factor authentication. The last screen in the user flow related to two-factor authentication using a telephone number is similar to the one depicted below:

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10



11      38.     Since at least September 2018, Twitter has prompted users to enable two-factor

12  authentication directly on users' timelines through a prompt similar to the screen depicted below:

13

14

15

16

17

18



19      39.     According to the 2022 FTC Complaint, until September 2019, Twitter did not

20  disclose at any point in the two-factor authentication pathway or in any of the associated links

21  described above that it was using the telephone numbers users provided for two-factor

22  authentication to target advertisements to those users.

23      40.     According to the 2022 FTC Complaint, from May 2013, approximately two million

24  users provided a telephone number to enable two-factor authentication.

25      41.     The fact that Twitter used the telephone numbers provided for two-factor

26  authentication for advertising would be material to users when deciding whether to provide a

27  telephone number for two-factor authentication.

28

CLASS ACTION COMPLAINT

**B.**     **Twitter's Deceptive Collection of Personal Information for Account Recovery**

42.     In June 2015, Twitter began prompting users to add a telephone number to their Twitter accounts as a safeguard in the event of a lost password. Then, in April 2018, Twitter also began prompting users to add an email address.

43.     Since June 2015, if users do not have a telephone number associated with their accounts, Twitter may prompt the users to add a telephone number through a message similar to the one depicted below:



44.     Similarly, since April 2018, if a user does not have an email address associated with their account, Twitter may prompt the user to add an email address through a message similar to the one depicted below:

45.     Through September 2019, Twitter did not disclose at any point in the account recovery pathway or any of the messages described above that it was using the telephone numbers or email addresses users provided for account recovery to target advertisements to those users.

46.     According to the 2022 FTC Complaint, from June 2015, approximately 37 million

10

users provided a telephone number or email address for account recovery purposes.

47.     The fact that Twitter used the telephone numbers and email addresses provided by users for the purpose of safeguarding their accounts for advertising would be material to users when deciding whether to provide their information for account recovery purposes.

**C.     Twitter's Deceptive Collection of Personal Information for Re-Authentication**

48.     In December 2013, Twitter began requiring users to provide a telephone number or email address for re-authentication (e.g., to re-enable full access to an account after Twitter has detected suspicious or malicious activity).

49.     If Twitter detects suspicious or malicious activity on a user's account, or suspects that the account may belong to a previously-banned user, Twitter may require the user to re-authenticate by providing a telephone number through a prompt similar to the one depicted below:

## Your account has been locked.


**Balh**
@sbtest0000

**What happened?**
We've locked your account because we've detected some unusual activity.

**What you can do:**
To unlock your account, you must do the following:


- Verify your phone number

**Start**

50.     If users click the "Start" button pictured above, they are instructed to enter a telephone number through a prompt similar to the one depicted below:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11



12    51.    Similarly, Twitter may require users to provide an email address to re-enable full

13    access to their accounts with a prompt similar to the one depicted below:

14
15
16
17
18
19
20
21
22

23    52.    Through September 2019, Twitter did not disclose at any point in the re-

24    authentication pathway described above that it was using the telephone numbers or email addresses

25    users provided for re-authentication to target advertisements to those users.

26    53.    According to the 2022 FTC Complaint, from September 2014, approximately 104

27    million users provided a telephone number or email address in response to a prompt for re-

28

CLASS ACTION COMPLAINT

authentication.

54.     The fact that Twitter used the telephone numbers and email addresses provided for re-authentication for advertising would be material to users when deciding whether to provide their information in response to a prompt for re-authentication.

**III.     Twitter Misrepresented that it Processed Personal Data in Accordance with the EU-U.S. and Swiss-U.S. Privacy Shield Frameworks**

55.     The European Union and Switzerland have each established regulatory regimes to protect individuals' right to privacy with respect to the processing of their personal data. Both privacy regimes generally prohibit businesses from transferring personal data to third countries unless the recipient jurisdiction's laws are deemed to adequately protect personal data.

56.     To ensure adequate privacy protections for commercial data transfers, the International Trade Administration of the U.S. Department of Commerce ("Commerce") coordinated with the European Commission and the Swiss Administration to craft the EU-U.S. and Swiss-U.S. Privacy Shield Frameworks ("Privacy Shield" or "Frameworks"). The Frameworks are materially identical.

57.     To rely on the Privacy Shield for data transfers, a company needed to self-certify and annually affirm to Commerce that it complied with the Privacy Shield Principles (the "Principles"). Of note, Principle 5(a) provided that "[a]n organization may not process personal information in a way that is incompatible with the purposes for which it has been collected or subsequently authorized by the individual." The Frameworks defined "processing" to include "any operation or set of operations which is performed upon personal data, whether or not by automated means" and includes, among other things, "collection," "storage," and "use" of personal information.

58.     Companies under the enforcement jurisdiction of the FTC, as well as the U.S. Department of Transportation, were eligible to join the EU-U.S. and Swiss-U.S. Privacy Shield Frameworks. A company under the FTC's jurisdiction that self-certified to the Privacy Shield Principles, but failed to comply with the Privacy Shield, may be subject to an enforcement action based on the FTC's deception authority under Section 5 of the FTC Act.

59.     Commerce maintains a public website, https://www.privacyshield.gov, where it posts the names of companies that have self-certified to the Privacy Shield. The listing of companies, found at https://www.privacyshield.gov/list, indicates whether the company's self-certification is current.

60.     On November 16, 2016, Twitter self-certified its participation in the Privacy Shield. Twitter has reaffirmed its participation in the Privacy Shield to Commerce each year thereafter.

61.     As described above, through at least September 2019, Twitter deceptively used personal information collected for specific security-related purposes for advertising.

62.     Twitter's use of such personal information for advertising purposes was not compatible with the purposes for which the information was collected, and Twitter did not obtain subsequent authorization from any individual to use such information for advertising.

63.     As a company under the jurisdiction of the FTC, Twitter's failure to comply with the Privacy Shield, is a violation of Section 5 of the FTC Act.

## IV.     Twitter Violated Its Privacy Policy and Cal. Bus. & Prof. Code § 22576

64.     Pursuant     to     its     Terms     of     Service,     Twitter's     "Privacy Policy (https://www.twitter.com/privacy) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information . . ."[4]

65.     Twitter's Privacy Policy—as set out at https://twitter.com/en/privacy—repeatedly touts how it respects its users privacy, and does not disclose user's information without their consent.

66.     For example, it states:

- "We believe you should always know what data we collect from you and how we

---

[4] Twitter Terms of Service, effective May 25, 2018, at § 2, *available at* https://twitter.com/en/tos/previous/version_13. Prior versions of the Terms of Service are virtually identical in this respect. *See, e.g.*, Twitter Terms of Service, effective June 25, 2012, at § 2, *available at* https://twitter.com/en/tos/previous/version_7 ("Any information that you provide to Twitter is subject to our Privacy Policy, which governs our collection and use of your information. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information . . ..".

CLASS ACTION COMPLAINT

use it, and that you should have meaningful control over both. We want to empower you to make the best decisions about the information that you share with us." Privacy Policy, p. 1.

- "We give you control through your settings to limit the data we collect from you and how we use it, and to control things like account security, marketing preferences, apps that can access your account, and address book contacts you've uploaded to Twitter. You can also download information you have shared on Twitter." Privacy Policy, p. 2.

67.    Most notably, § 3.1 of the Privacy Policy promises that:

> **We share or disclose your personal data with your consent or at your direction**, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business. . . .
>
> Subject to your settings, we also provide certain third parties with personal data to help us offer or operate our services. You can learn more about these partnerships in our Help Center, and **you can control whether Twitter shares your personal data in this way by using the "Allow additional information sharing with business partners" option in your Personalization and Data settings**. (This setting does not control sharing described elsewhere in our Privacy Policy, such as when we share data with our service providers, or through partnerships other than as described in our Help Center.)

68.    As described herein, Twitter did not abide by its Privacy Policy in that Plaintiff and Class Members did not "know what data" Twitter "collect[ed] from [them] and how we use[d] it," nor did Plaintiff and Class Members "have meaningful control over both"; Twitter did not give its users "control through your settings to limit the data we collect from you and how we use"; and most importantly Twitter did "share or disclose [users] personal data" without their "consent or at [users'] direction; all contrary to the their Privacy Policy.

69.    Importantly, Cal. Bus. & Prof. Code § 22576, prohibits an "operator of a commercial Web site or online service that collects personally identifiable information through the Web site or online service from individual consumers who use or visit the commercial Web site or online

service" from "knowingly and willfully" or "negligently and materially" failing "to comply with" the "provisions of its posted privacy policy."

70.     Here, Twitter either "knowingly and willfully" or "negligently and materially" failed "to comply with" the "provisions of its posted privacy policy," in violation of Cal. Bus. & Prof. Code § 22576.

**V.     Tolling of the Statute of Limitations**

71.     Any applicable statutes of limitations have been tolled under (1) the fraudulent concealment doctrine, based on Twitter's knowing and active concealment and denial of the facts alleged herein and (2) the delayed discovery doctrine, as Plaintiff did not and could not reasonably have discovered Twitter's conduct alleged herein until shortly before the Complaint was filed.

72.     Twitter never disclosed, or adequately disclosed, that it would use the collected Personal Information of Plaintiff and Class Members for advertising purposes.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff seeks relief on behalf of herself and as representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a nationwide class defined as follows:

> **All individuals residing in the United States who between May 2013 and September 2019 provided his or her telephone number(s) and/or email address(es) ("Personal Information") to Twitter for purposes of two-factor authentication, account recovery, and/or account re-authentication (the "Nationwide Class").**

74.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

75.     Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

76.     The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

77.     **Ascertainability**: Membership of the Class is defined based on objective criteria and individual members will be identifiable from Twitter's records, including from Twitter's massive data storage, consumer accounts, and enterprise services.  Based on information readily accessible to it, Twitter can identify members of the Class who were victims of Twitter's impermissible collection and use of the Personal Information as alleged herein.

78.     **Numerosity**: The Class consists of millions of individuals.  Specifically, as noted above, according to the 2022 FTC Complaint, from May 2013, approximately two million users provided a telephone number to enable two-factor authentication; from June 2015, approximately 37 million users provided a telephone number or email address for account recovery purposes; and from September 2014, approximately 104 million users provided a telephone number or email address in response to a prompt for re-authentication. Accordingly, members of the Class are so numerous that joinder of all members is impracticable.  Class members may be identified from Defendant's records, including from Twitter's consumer accounts and enterprise services.

79.     **Predominant Common Questions**: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Common questions for the Class include, but are not limited to, the following:

        a.     Whether, during the class period, Twitter disclosed, or adequately disclosed, the purposes for which it was collecting and using the Personal Information;

        b.     Whether, during the class period, Twitter used the collected Personal Information for purposes other than for two-factor authentication, account recovery, and/or account re-authentication, and, specifically whether Twitter used the Personal Information for marketing and/or advertising purposes;

        c.     Whether Twitter's practice of collecting and utilizing the Personal Information violated the 2011 Commission Order and/or the FTC Act;

17

d.      Whether Twitter's practice of collecting and utilizing the Personal Information violated state and federal privacy laws;

e.      Whether Twitter's practice of collecting and utilizing the Personal Information violated tort laws;

f.      Whether Twitter has been unjustly enriched by its practice of collecting and utilizing the Personal Information;

g.      Whether Plaintiff and Class Members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

h.      Whether Plaintiff and Class members have sustained damages as a result of Twitter's conduct and if so, what is the appropriate measure of damages or restitution.

80.    **Typicality**: Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were uniformly affected by Twitter's wrongful conduct in violation of law as complained of herein.

81.    **Adequacy of Representation**: Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class action litigation, including nationwide class actions and privacy violations.  Plaintiff and her counsel have no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.

82.    **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court.  Furthermore, as the damages individual Class members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in management of this action as a class action.

83.     **California Law Applies to the Entirety of the Class**: California's substantive laws apply to every member of the Class, regardless of where in the United States the Class member resides. Defendant's own Terms of Service explicitly states "The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and Twitter. All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum."[5]  By choosing California law for the resolution of disputes covered by its Terms of Service, Twitter concedes that it is appropriate for this Court to apply California law to the instant dispute to all Class members.  Further, California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class members under the Due Process Clause, *see* U.S. CONST. amend. XIV, § 1, and the Full Faith and Credit Clause, *see* U.S. CONST. art. IV, § 1, of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, to the claims asserted by the Plaintiff and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.  Defendant's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.  The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class and California has the greatest interest in applying its laws here.

84.     Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

---

[5] *See* Twitter Terms of Service, effective May 25, 2018, at § 6, *available at* https://twitter.com/en/tos/previous/version_1. Prior versions of the Terms of Service are virtually identical in this respect.  *See, e.g.*, Twitter Terms of Service, effective June 25, 2012, at § 12.B, *available at* https://twitter.com/en/tos/previous/version_7 ("These Terms and any action related thereto will be governed by the laws of the State of California without regard to or application of its conflict of law provisions or your state or country of residence. All claims, legal proceedings or litigation arising in connection with the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to the jurisdiction of and venue in such courts and waive any objection as to inconvenient forum.").

## **COUNTS**

### **COUNT ONE: BREACH OF CONTRACT**
(On Behalf of Plaintiff and the Nationwide Class)

85.     Plaintiff hereby incorporates Paragraphs 1 through 84 as if fully stated herein.

86.     Twitter's relationship with its users is governed by the Twitter Terms of Service, the Twitter Privacy Policy.

87.     The Twitter Privacy Policy repeatedly promises Plaintiff and Class members that Twitter respects their information and discloses such information only with users' consent.

88.     Specifically, Twitter's Privacy Policy states:

- "We believe you should always know what data we collect from you and how we use it, and that you should have meaningful control over both. We want to empower you to make the best decisions about the information that you share with us." Privacy Policy, p. 1.

- "We give you control through your settings to limit the data we collect from you and how we use it, and to control things like account security, marketing preferences, apps that can access your account, and address book contacts you've uploaded to Twitter. You can also download information you have shared on Twitter." Privacy Policy, p. 2.

89.     Most notably, § 3.1 of the Privacy Policy promises that:

> **We share or disclose your personal data with your consent or at your direction**, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business. . . .
>
> Subject to your settings, we also provide certain third parties with personal data to help us offer or operate our services. You can learn more about these partnerships in our Help Center, and **you can control whether Twitter shares your personal data in this way by using the "Allow additional information sharing with business partners" option in your Personalization and Data settings**. (This setting does not control sharing described elsewhere in our Privacy Policy, such as when we share data with our service providers, or through partnerships other than as described in our Help Center.)

90.    Twitter breached these promises.

91.    As described herein, Plaintiff and Class Members did not "know what data" Twitter "collect[ed] from [them] and how [Twitter] use[d] it," nor did Plaintiff and Class Members "have meaningful control over both"; Twitter did not give its users "control through your settings to limit the data we collect from you and how we use"; and most importantly Twitter did "share or disclose [users] personal data" without their "consent or at [users'] direction"; all contrary to the their Privacy Policy.

92.    Plaintiff and Class members fulfilled their obligations under the relevant contracts and are not in breach of any.

93.    As a result of Twitter's breach(es), Twitter was able to obtain the personal property of Plaintiff and Class members and earn unjust profits.

94.    Plaintiff and Class Members also did not receive the benefit of the bargain for which they contracted and for which they paid valuable consideration in the form of the personal information they agreed to share, which has ascertainable value to be proven at trial.

95.    Plaintiff, on behalf of themselves and Class members, seek compensatory damages, consequential damages, nominal damages, and/or non-restitutionary disgorgement in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

**COUNT TWO: BREACH OF IMPLIED CONTRACT**
(Alleged In the Alternative to Count I)
(On Behalf of Plaintiff and the Nationwide Class)

96.    Plaintiff hereby incorporates Paragraphs 1 through 844 as if fully stated herein.

97.    Defendant solicited and collected the Personal Information of Plaintiff and Class Members with the express representation that it would be used for two-factor authentication, account recovery, and/or account re-authentication.

98.    In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to utilize the Personal Information solely for the purposes expressed: two-factor authentication, account recovery, and/or account re-authentication, and no other purposes such as marketing and/or advertising.

99.     A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their Personal Information to Defendant.

100.     Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

101.     Defendant breached the implied contracts it made with Plaintiff and the Class by utilizing and profiting from their Personal Information via the marketing and advertising purposes the information was put to.

102.     As a result of Defendant's breach of implied contract, Plaintiff and the Class are entitled to and demand actual, consequential, and nominal damages.

**COUNT THREE: UNFAIR COMPETITION LAW ("UCL"),**
**CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***
(On Behalf of Plaintiff and the Nationwide Class)

103.     Plaintiff hereby incorporates Paragraphs 1 through 844 as if fully stated herein.

104.     The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (UCL).  By engaging in the practices aforementioned, Twitter has violated the UCL.

105.     Twitter's "unlawful" acts and practices include its violation of the 2011 Commission Order and Section 5 of FTC Act, violation of the Privacy Shield and Frameworks, and violation of Cal. Bus. & Prof. Code § 22576.

106.     Twitter's conduct violated the spirit and letter of these laws, which prohibit unauthorized disclosure and collection of personal information.

107.     Twitter's "unfair" acts and practices include its misrepresentations regarding, and failure to disclose the purposes for which it was collecting and utilizing, the Personal Information, as described above, and its subsequent use of that information for profit.

108.     Plaintiff and Class members have suffered injury-in-fact, including the loss of money and/or property as a result of Twitter's unfair and/or unlawful practices, to wit, the unauthorized disclosure and use of their Personal Information which has value as demonstrated by its use for targeted advertising by Twitter.  Plaintiff and Class Members have suffered harm in the form of

1  diminution of the value of their private and personally identifiable data and content.

2  109.   Twitter's actions caused damage to and loss of Plaintiff's and Class Members'
3  property right to control the dissemination and use of their personal information.

4  110.   Twitter reaped unjust profits and revenues in violation of the UCL. This includes
5  Twitter's profits and revenues from their targeted-advertising. Plaintiff and the Class seek
6  restitution and disgorgement of these unjust profits and revenues.

7  **COUNT FOUR: UNJUST ENRICHMENT**
(Alleged In the Alternative to Counts 1 & 2)
8  (On Behalf of Plaintiff and the Nationwide Class)

9  111.   Plaintiff hereby incorporates Paragraphs 1 through 84 as if fully stated herein.

10  112.   Plaintiff and Class members conferred a benefit on Twitter.  Specifically, they
11  provided Twitter with their Personal Information.  In exchange, Plaintiff and Class Members
12  should have received from Twitter the services that were the subject of the transaction—two-
13  factor authentication, account recovery, and/or account re-authentication services—and should have
14  been entitled to have Twitter not disclose and use their Personal Information for targeted
15  advertising and/or marketing purposes.

16  113.   Twitter knew that Plaintiff and Class members conferred a benefit on Twitter and
17  has accepted or retained that benefit. Twitter profited from the Personal Information of Plaintiff
18  and Class Members for business purposes, without disclosing to, or authorization from, Plaintiff
19  and Class members to so use the Personal Information.

20  114.   Thus, Twitter acquired the Personal Information through inequitable means in that
21  it failed to disclose all the purposes for which it would use the Personal Information, and
22  misrepresented those uses.

23  115.   Plaintiff and Class members have no adequate remedy at law.

24  116.   Under the circumstances, it would be unjust for Twitter to be permitted to retain
25  any of the benefits that Plaintiff and Class members conferred on it.

26  117.   Twitter should be compelled to disgorge into a common fund or constructive trust,
27  for the benefit of Plaintiff and Class members, proceeds that it unjustly received—specifically all

28

revenue related to the targeted advertising and/or marketing that utilized the improperly obtained Personal Information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Certify this action is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Appoint Plaintiff to represent the Class;

C.      Appoint undersigned counsel to represent the Class;

D.      Award compensatory damages, including statutory damages where available, to Plaintiff and the Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

E.      Award nominal damages to Plaintiff and the Class members against Defendant;

F.      Non-restitutionary disgorgement of all of Defendant's profits that were derived, in whole or in part, from Twitter's collection and subsequent use of Plaintiff's Personal Information;

G.      Ordering Defendant to disgorge revenues and profits wrongfully obtained;

H.      Award Plaintiff and the Class members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

I.      Grant Plaintiff and the Class members such further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

The Plaintiff demands a trial by jury of all issues so triable.

Date: May 31, 2022                                  Respectfully Submitted,


                                                    *Michael F. Ram*

                                                    MICHAEL F. RAM (SBN 104805)
                                                    **MORGAN & MORGAN COMPLEX**
                                                    **LITIGATION GROUP**
                                                    711 Van Ness Avenue, Suite 500
                                                    San Francisco, CA 94102
                                                    Telephone:     (415) 358-6913

24

Facsimile:     (415) 358-6923
mram@ForThePeople.com

JOHN A. YANCHUNIS
(*Pro Hac Vice application forthcoming*)
JEAN SUTTON MARTIN
(*Pro Hac Vice application forthcoming*)
PATRICK BARTHLE
(*Pro Hac Vice application forthcoming*)
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 559-4908
Facsimile: (813) 222-4795
jyanchunis@ ForThePeople.com
jeanmartin@ForThePeople.com
pbarthle@ForThePeople.com


*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT