UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAUREN PRICE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>TWITTER, INC.,<br><br>　　　　　Defendant. | Case No. 22-cv-03173-SK<br><br>**ORDER ON MOTION TO DISMISS**<br><br>Regarding Docket Nos. 29, 30 |

This matter comes before the Court upon consideration of Twitter, Inc.'s motion to dismiss. Having carefully considered the parties' papers, relevant legal authority, and the record in the case, and having had the benefit of oral argument, the Court hereby grants Twitter's motion for the reasons set forth below. The Court GRANTS Twitter's request for judicial notice. Fed. R. Evid. 201.

## BACKGROUND

Plaintiff Lauren Price brings this putative class action against Twitter related to Twitter's disclosure of Plaintiff's and the purported class's telephone numbers and email addresses ("personal information"). (Dkt. No. 1 (Compl.), ¶ 3.) Plaintiff alleges that Twitter disclosed her personal information for advertising and marketing purposes. (*Id*.) Twitter collected Plaintiff's personal information under the guise that it would be used for security related functions, such as two-factor authentication and account recovery. (*Id*., ¶ 4.) However, Twitter also used this personal information for its marketing products, enabling advertisers to target specific groups of Twitter users by matching telephone numbers and email addresses that Twitter had collected to the advertisers' own existing or purchased lists of telephone numbers and email addresses. (*Id*., ¶ 5.)

Commercial entities regularly use Twitter to advertise to consumers. Of the $3.4 billion in revenue that Twitter earned in 2019, $2.99 billion was from advertising. (*Id*., ¶ 24.) While

Twitter represented to users, including Plaintiff, that it collected users' telephone numbers and email addresses to secure their accounts, Twitter failed to disclose that it also used their personal information to aid advertisers in reaching their preferred audiences. (*Id*., ¶ 27.) Twitter's misrepresentations violate an order from the Federal Trade Commission issued in 2011, which specifically prohibited Twitter from making misrepresentations regarding the security of nonpublic consumer information such as their emails and phone numbers. (*Id*., ¶ 28.)

The International Trade Administration of the U.S. Department of Commerce (the "Commerce Department") coordinated with the European Commission and the Swiss Administration to craft Privacy Shield Frameworks for commercial data transfers. (*Id*., ¶ 56.) Companies self-certify and annually affirm to the Commerce Department that they complied with the Privacy Shield Principles, including that "[a]n organization may not process personal information in a way that is incompatible with the purposes for which it has been collected or subsequently authorized by the individual." (*Id*., ¶ 57.) A company under the FTC's jurisdiction that self-certified to the Privacy Shield Principles, but failed to comply with the Privacy Shield, may be subject to an enforcement action based on the FTC's deception authority under Section 5 of the FTC Act. (*Id*., ¶ 58.) On November 16, 2016, Twitter self-certified its participation in the Privacy Shield and has reaffirmed its participation in the Privacy Shield to the Commerce Department each year thereafter. (*Id*., ¶ 60.)

Twitter states in its Terms of Service:

> Twitter's "Privacy Policy (https://www.twitter.com/privacy) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information . . .

(*Id*., ¶ 64.) Twitter's Privacy Policy in turn states:

> We believe you should always know what data we collect from you and how we use it, and that you should have meaningful control over both. We want to empower you to make the best decisions about the information that you share with us.

(Dkt. No. 29-3 (Privacy Policy attached as Ex. B to the Declaration of Susan B. Engel), p. 1.)

> When you use Twitter, even if you're just looking at Tweets, we receive some personal information from you like the type of device

2

>you're using and your IP address. You can choose to share additional information with us like your email address, phone number, address book contacts, and a public profile. We use this information for things like keeping your account secure and showing you more relevant Tweets, people to follow, events, and ads.
>
>We give you control through your settings to limit the data we collect from you and how we use it, and to control things like account security, marketing preferences, apps that can access your account, and address book contacts you've uploaded to Twitter. You can also download information you have shared on Twitter.

(*Id*., p. 2.)

>We use your contact information, such as your email address or phone number, to authenticate your account and keep it - and our services - secure, and to help prevent spam, fraud, and abuse. *We also use contact information to enable certain account features (for example, for login verification or Twitter via SMS), and to send you information about our services, and to personalize our services, including ads. . . .*

(*Id*., § 1.3 (emphasis added).)

>We share or disclose your personal data with your consent or at your direction, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business . . . .
>
>Subject to your settings, we also provide certain third parties with personal data to help us offer or operate our services. You can learn more about these partnerships in our Help Center, and you can control whether Twitter shares your personal data in this way by using the "Allow additional information sharing with business partners" option in your Personalization and Data settings. (This setting does not control sharing described elsewhere in our Privacy Policy, such as when we share data with our service providers, or through partnerships other than as described in our Help Center.)

(*Id*., § 3.1.)

Plaintiff alleges that Twitter violated its Privacy Policy because Plaintiff and the purported class members did not "know what data" Twitter "collect[ed] from [them] and how we use[d] it," because Plaintiff and purported class members did not have "have meaningful control over both," because Twitter did not give its users "control through [their] settings to limit the data we collect from you and how we use" it, and because Twitter did "share or disclose [users'] personal data" without their "consent or at [users'] direction. (Dkt. No. 1, ¶ 68.)

Based on these allegations, Plaintiff brings the following four claims against Twitter: (1) breach of contract; (2) breach of the implied contract; (3) violation of California's Unfair

3

1  Competition Law ("UCL"), California Business & Professions Code § 17200; and (4) unjust
2  enrichment.

### ANALYSIS

**A.      Applicable Legal Standard on Motion to Dismiss.**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. On a motion to dismiss under Rule 12(b)(6), the Court construes the allegations in the complaint in the light most favorable to the non-moving party and takes as true all material allegations in the complaint. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986). Even under the liberal pleading standard of Rule 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Rather, a plaintiff must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile. *See, e.g. Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Lieche, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

As a general rule, "a district court may not consider material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds, Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted). However, documents subject to judicial notice, such as matters of public record, may be considered on a motion to dismiss. *See Harris v. Cnty of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2011). In doing so, the Court does not convert a motion to dismiss to one for summary judgment.

*See Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). "The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice . . . ." *Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001).

**B.    Twitter's Motion to Dismiss.**

**1.    Injury.**

To establish Article III standing, a plaintiff must show that he or she has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (alterations and internal quotation marks omitted). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Moreover, "[w]here, as here, a case is at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element. *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). To allege injury in fact, a plaintiff must allege that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal quotation marks omitted). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc.*, 578 U.S. at 340. "[S]tanding is claim- and relief-specific, such that a plaintiff must establish Article III standing for each of her claims and for each form of relief sought." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1064-65 (N.D. Cal. 2015) (internal quotations omitted) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("our standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press")).

Additionally, to have standing to bring a claim under the UCL, Plaintiffs must have suffered an injury in fact and must have lost money or property as a result of the unfair competition. *See* Cal. Bus. & Prof. Code § 17204; *see also Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227 (2006). "To satisfy the narrower standing requirements imposed by Proposition 64, a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that the

economic injury was the result of, i.e., *caused by,* the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis in original).

The California Supreme Court noted that "'[i]njury in fact' is a legal term of art . . . for federal standing under [A]rticle III. . . ." *Kwikset*, 51 Cal. 4th at 322. By selecting this phrase in Proposition 64, "the drafters and voters intended to incorporate the established federal meaning." *Id*. While Article III standing may be premised on a non-economic injury, such as invasion of privacy, Plaintiff has not yet alleged such an injury. Therefore, the Court will evaluate standing under Article III and the UCL together.[1]

"Numerous courts have held that disclosure of personal information alone does not constitute economic or property loss sufficient to establish UCL standing, unless the plaintiff provides specific allegations regarding the value of the information." *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1144-45 (E.D. Cal. 2021) (citing *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, *22 (N.D. Cal. Aug. 30, 2017) (rejecting UCL standing to victims of data breach who had failed to allege specific benefit-of-the-bargain losses or out-of-pocket expenses); *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 714 (N.D. Cal. 2011), aff'd 572 F. App'x 494 (9th Cir. 2014) ("A plaintiff's 'personal information does not constitute property under the UCL."); *Archer v. United Rentals, Inc.*, 195 Cal. App. 4th 807, 816 (2011) (dismissing UCL invasion of privacy claim because "plaintiffs have failed to demonstrate how . . . unlawful collection and recordation of personal information . . . translates into a loss of money or property")); *see also Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 484 (N.D. Cal. Apr. 30, 2021)

---

[1] In light of Plaintiff's failure to allege that Twitter *disclosed* her phone number and/or email to advertisers and that she alleges advertisers already had or were able to purchase her phone number and email from other sources, it is not clear that she could plead an invasion of her privacy rights based on Twitter's conduct. Additionally, at least one court has questioned whether a plaintiff could allege an invasion of privacy from disclosure of basic contact information. *See I.C. v. Zynga, Inc.*, 2022 WL 2252636, at *8 (N.D. Cal. Apr. 29, 2022) ("the Court is hard pressed to conclude that basic contact information, including one's email address, phone number, or Facebook or Zynga username, is private information. All of this information is designed to be exchanged to facilitate communication and is thus available through ordinary inquiry and observation."). Nevertheless, as discussed below, the Court provides Plaintiff with an opportunity to amend her complaint.

1  (rejecting theory of economic injury based on "loss of the inherent value of . . . personal data");
2  *Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 849 (N.D. Cal. 2014) (noting that courts "have
3  consistently rejected" a broad interpretation of "money or property" that would include personal
4  information); *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 862-63 (N.D. Cal. 2011) (rejecting
5  plaintiff's allegation that his personal information constitutes a form of money or property
6  sufficient to state a UCL claim).

7  The discussion in the recent California case *Moore v. Centrelake Med. Grp., Inc.*, 83 Cal.
8  App. 5th 515 (2022) is instructive. The court in *Moore* held that the lost value of personal
9  identifying information ("PII") was insufficient to support standing for a UCL claim. First, the
10  court noted that the plaintiffs' allegations were not supported where they:

> pled only that their PII was stolen and disseminated, and that a market for it existed. They did not allege they ever attempted or intended to participate in this market, or otherwise to derive economic value from their PII. Nor did they allege that any prospective purchaser of their PII might learn that their PII had been stolen in this data breach and, as a result, refuse to enter into a transaction with them, or insist on less favorable terms.

15  *Id.*, 83 Cal. App. 5th at 538-39 (citing *In re Google Inc. Cookie Placement Consumer Privacy*
16  *Litigation* (3d Cir. 2015) 806 F.3d 125, 149, 152 ("when it comes to showing 'loss,' the plaintiffs'
17  argument lacks traction. They allege no facts suggesting that they ever participated or intended to
18  participate in the market they identify, or that the defendants prevented them from capturing the
19  full value of their internet usage information for themselves"); *Bass v. Facebook, Inc.*, 394 F.
20  Supp. 3d 1024, 1040 (N.D. Cal. 2019) ("That the information has external value, but no economic
21  value to plaintiff, cannot serve to establish that plaintiff has personally lost money or property")).

22  The court similarly rejected the theory of loss of PII to support an award of contractual
23  damages. *Id.*, 83 Cal. App. 5th at 539. The court found the analysis in *In re Jetblue Airways*
24  *Corp. Priv. Litig.*, 379 F. Supp. 2d 299 (E.D.N.Y. 2005) persuasive, in which the court found that
25  the plaintiffs had "'ignore[d] the nature of the contract asserted,' under which appellants had no
26  expectation interest in the economic value of their PII." *Moore*, 83 Cal. App. 5th at 539. The
27  court also found *Pruchnicki v. Envision Healthcare Corporation*, 845 Fed. Appx. 613 (9th Cir.
28  2021), persuasive in which "the Ninth Circuit affirmed dismissal of a breach of contract claim

7

where, despite studies showing PII 'may have value in general,' the plaintiff failed to adequately allege that as a result of a data breach, her PII 'actually lost value.'" *Moore*, 83 Cal. App. 5th at 540 (citing *LaCourt v. Specific Media, Inc.*, 2011 WL 1661532, at *5 (C.D. Cal. Apr. 28, 2011) (no Article III standing where plaintiffs failed to allege they personally "ascribed an economic value" to their internet-history information or were "foreclosed from entering into a 'value-for-value exchange' as a result of [defendant's] alleged conduct").

Plaintiff alleges that, between May 2013 and September 2019, she provided her telephone numbers *and/or* email addresses to Twitter for two-factor authentication, account recovery, *and/or* account re-authentication. (Dkt. No. 1, ¶ 9.) It is not even clear if Plaintiff accuses Twitter of using both her phone number and email address or whether she provided her phone number and/or email address in the context of two-factor authentication, account recovery, or account re-authentication. Moreover, as discussed at the hearing, it is not even clear if Twitter *disclosed* Plaintiff's email address or telephone number to advertisers or simply *matched* Plaintiff's email address or telephone number to lists the advertisers provided. In terms of injury, Plaintiff vaguely alleges she "suffered harm in the form of diminution of the value of [her] private and personally identifiable data and content []" from Twitter's unauthorized disclosure and use of her telephone number or email address. (*Id.*, ¶ 108.) She also vaguely alleges that her telephone number and/or email address "has value as demonstrated by its use for targeted advertising by Twitter." (*Id.*) However, Plaintiff has not alleged that she could sell her phone number and email address or that it otherwise has economic value to *her*, as opposed to the value that Twitter gained by aggregating that data. The Court finds that Plaintiff fails to allege any concrete injury to show an injury in fact due to Twitter's use of her phone number and/or email address.

Plaintiff's breach of contract claim requires further explanation. Plaintiff argues that actual injury, apart from a breach, is not necessary to have standing to bring a breach of contract claim because California law allows for nominal damages. In *Spokeo*, the Supreme Court made clear that a statutory violation, divorced from any concrete harm, was insufficient to satisfy the injury-in-fact requirement of Article III. *Spokeo*, 578 U.S. at 341. Courts in this District, both relying on *Spokeo*, are split on whether the allowance of nominal damages under California law satisfies

8

1 Article III standing requirements to demonstrate an injury in fact. *Compare Svenson v. Google*
2 *Inc.*, 2016 WL 8943301, at *10 (N.D. Cal. Dec. 21, 2016) (finding under *Spokeo, Inc.*, 578 U.S. at
3 339-43 "that although California law permits recovery of nominal damage when it is difficult to
4 quantify the amount of damages flowing from a particular injury, a plaintiff still must show the
5 *fact* of injury in order to have Article III standing. The potential availability of nominal damages
6 once an injury has been established does not satisfy Article III.") (emphasis in original) *with In re*
7 *Google Referrer Header Priv. Litig.*, 465 F. Supp. 3d 999, 1010-11 (N.D. Cal. 2020) ("An
8 individual to whom a contractual duty is owed may, therefore, allege a concrete legal injury by
9 virtue of the duty's breach, apart from any actual damages stemming from that breach[]" and is
10 sufficient to establish Article III standing under *Spokeo*.). However, the court in *In re Google*
11 relied on a concurring opinion which the Supreme Court later clarified what it had rejected. *See*
12 *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 n.3 (2021) (J. Thomas "would reject the core
13 standing principle that a plaintiff must always have suffered a concrete harm, and would cast aside
14 decades of precedent articulating that requirement. . ."). *TransUnion* made clear that "under
15 Article III, an injury in law is not an injury in fact." *Id*., 141 S. Ct. at 2205. "Only those plaintiffs
16 who have been *concretely harmed* by a defendant's statutory violation may sue that private
17 defendant over that violation in federal court." *Id*. (emphasis in original). A breach of contract
18 without any concrete harm is akin to a statutory violation without any concrete harm. The fact
19 California has authorized nominal damages under such circumstances does not alter the Article III
20 standing analysis under *Spokeo* and *TransUnion*. Accordingly, the Court finds that Plaintiff has
21 not sufficiently alleged an injury-in-fact for her breach of contract claim as well. Therefore, the
22 Court GRANTS Twitter's motion to dismiss WITH LEAVE TO AMEND.
23 A brief discussion of some of Plaintiff's additional deficiencies, below, is helpful to
24 provide Plaintiff with some guidance for amendment.
25 First, the "promise" or language which Plaintiff alleges Twitter breached is in Twitter's
26 Privacy Policy. However, the same Privacy Policy also discloses that Twitter would use
27 Plaintiff's email address and phone number, as well as other information, to show Plaintiff more
28 relevant advertisements and would provide Plaintiff an opportunity to opt out of Twitter's use of

her personal information. Plaintiff's arguments at oral argument as to why these disclosures and opportunities to opt out were immaterial to her claims were unclear.

Second, although a plaintiff may plead inconsistent theories of recovery, such as claims alleging both the existence and the absence of an enforceable contract "a plaintiff may not plead the existence of an enforceable contract and simultaneously maintain a quasi-contract claim unless the plaintiff also pleads facts suggesting that the contract may be unenforceable or invalid." *Saroya v. Univ. of the Pac.*, 503 F. Supp. 3d 986, 998 (N.D. Cal. 2020). If Plaintiff elects to amend her complaint and seeks to bring an implied contract claim as well as an express contract claim, she should clearly allege in the alternative facts which suggest the contract may be unenforceable or invalid.

Third, to the extent Plaintiff seeks equitable relief, she must allege facts to support her contention that she lacks an adequate remedy at law.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Twitter's motion to dismiss WITH LEAVE TO AMEND. Plaintiff shall file her amended complaint, if any, by no later than December 29, 2022.

**IT IS SO ORDERED**.

Dated: December 6, 2022

_____
SALLIE KIM
United States Magistrate Judge